IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| LASHUNDRA ROGERS,<br>individually and as next<br>friend of A.B., a minor, | ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| v. | ) ) | 2:21cv455-MHT<br>(WO) |
| PIKE ROAD BOARD OF<br>EDUCATION, | ) ) ) | |
| Defendant. | ) | |


## ORDER ON PRETRIAL HEARING

A pretrial hearing was held in this case on December 12, 2023, at 9:00 a.m. by videoconference wherein the following proceedings were held and actions taken:

1.  PARTIES AND TRIAL COUNSEL:

    Lashundra Rogers, individually, and as next friend of A.B., a minor
    Plaintiff

    Algert S. Agricola Jr.
    Barbara H. Agricola
    Agricola Law, LLC
    127 South 8th Street
    Opelika, AL 36801
    334.759.7557
    al@agricolalaw.com
    barbara@agricolalaw.com

1

Pike Road Board of Education
Defendant

Carl Johnson
Bishop, Colvin, Johnson & Kent, LLC
1910 First Avenue North
Birmingham, AL 35203
205.251.2881
carljohnson@bishopcolvin.com

Lane Knight
Balch & Bingham, LLP
445 Dexter Avenue, Suite 8000
Montgomery, AL 36104
334.834.6500
lknight@balch.com

COUNSEL APPEARING AT PRETRIAL HEARING:

Algert S. Agricola Jr.
Barbara H. Agricola
Counsel for Plaintiff

Carl Johnson
Lane Knight
Counsel for Defendant

2.      JURISDICTION AND VENUE:

Plaintiff asserts claims against Defendant Pike Road Board of Education for monetary damages under Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373, as amended, 20 U.S.C. §§ 1681, *et seq.* This Court has jurisdiction over Plaintiff's claims on behalf of A.B. against Defendant Pike Road Board of Education under 28 U.S.C. §§ 1331 and 1343, because Plaintiff seeks to redress A.B.'s civil right guaranteed by Act of Congress not to be discriminated against on the basis of sex by any recipient of federal education funding and/or not to be subjected to sexual harassment and retaliation so severe, pervasive, and objectively offensive that it denied A.B. the equal access to education that Title IX is designed to protect.

All acts complained of in the Complaint occurred within the Middle District of Alabama.   Venue is proper in the northern division of this district under 28 U.S.C. § 1391.

3.     PLEADINGS: The following pleadings and amendments were allowed:

Plaintiff's Complaint [Doc. 1]
Defendant's Answer [Doc. 21]
Plaintiff's First Amended Complaint [Doc.31]
Defendant's Answer to First Amended Complaint [Doc. 33]
Plaintiff's Second Amended Complaint [Doc. 40]
Defendant's Answer to Second Amended Complaint [Doc. 41]

4.     CONTENTIONS OF THE PARTIES:

(a) The plaintiff

On three consecutive days beginning on October 23, 2029, and continuing through October 25, 2019, A.B., a fourteen-year-old ninth grade student, was sexually assaulted by S.H., a seventeen-year-old eleventh grade student, as she rode the school bus to and from Pike Road High School. All of the incidents were recorded with video cameras on the school bus. Defendant initially produced only one video of very poor quality from the morning bus run on October 25, 2019. *See* Plaintiff's Exhibit 3(a) to the Deposition of David Sikes. Defendant concealed from Plaintiff, and from its own counsel, the other four videos until June 13, 2023, 1,328 days after Defendant received the videos from its bus driver, Jarvis Frazier, on October 25, 2019. The video from the October 24, 2019, afternoon bus run clearly shows the sexual assault and choking by S.H. on A.B. *See* Plaintiff's Exhibit 3(b) to Deposition of David Sikes.

On October 25, 2019, Defendant's bus driver, Jarvis Frazier, noticed something unusual about the behavior of S.H. and A.B. on the bus and reviewed the videos from that day and the previous two days with co-workers. Mr. Frazier concluded that S.H. had sexually assaulted A.B. and choked her. He reported the incidents to his supervisor, Angela Lang, who reported the incidents to David Sikes, Principal of Pike Road High School, and provided him with the videos by loading them to the Defendant's server so that he could access them from his office computer.

3

After reviewing the videos with Assistant Principals Terina Gantt and Turkessia McGaskill, Principal Sikes informed School Resource Officer ("SRO") Isaac Forbes who notified his supervisor in the Montgomery County Sheriff's Office. Later, A.B. was called out of class to meet with Gantt, McGaskill, and Sikes in the Principal's Office. Reluctantly and with some assurances that she was not in trouble, A.B. described what happened to her on the bus over the course of three days. A.B. said S.H. had touched her "privates," her chest area under her shirt, and had choked her. She wrote a statement which did not fully recount the details of her assault. During her interview in the Principal's Office, A.B. was scared, nervous, and crying.

Around 3:00 p.m., Principal Sikes called Plaintiff to ask her to come to school "now" because something had happened to A.B. on the bus. Sikes told Plaintiff that A.B. had not ridden the bus that afternoon and that she was in the office with him. Plaintiff called her husband, Keith Gamble, who picked Plaintiff up from work and they drove to the school.

At some point before Plaintiff and her husband arrived at the school, a detective from the Montgomery County Sheriff's Office arrived, viewed the videos, and informed Principal Sikes that S.H.'s conduct constituted felony sexual assault that he intended to place S.H. under arrest. S.H. was arrested and placed in the back of a Montgomery County Sheriff's unit about the time that school let out and while students were milling around in the area where the Sheriff's unit was parked.

When Plaintiff and her husband arrived at the school, they went to the Principal's Office and were placed in an office alone and waited for 30 minutes to an hour for someone to tell them what happened.  Then Ms. McGaskill, Ms. Gantt, and Mr. Sikes came into the room and Ms. McGaskill told them that A.B. was not in trouble and that it was nothing that she had done. Ms. McGaskill said A.B. was safe and in another room. Ms. McGaskill said that they would be back shortly to talk to them and they left the room. *Id*. at 19, ll. 4-12. Plaintiff and her husband waited for some period of time until someone knocked on the door, and several people came into the room. A lady introduced herself as a DHR worker and explained that when something happens to a child in school, DHR has to be involved. *Id.* at 19, l. 16 through 20, l. 6. Ms. Gantt was crying at this point. Ms. McGaskill said something happened to A.B. on the bus.   *Id.* at 20, l. 23 through 21, l. 1. Ms. McGaskill said that she talked to A.B. but A.B. was not forthcoming about anything that happened. Ms. McGaskill told Plaintiff and her husband that

the bus driver had seen something that alarmed him so he reviewed the video recorded from his bus's cameras from three days. Ms. McGaskill said that something went on for approximately three days with A.B. on the bus. *Id.* at 21, ll. 2-13.

In tears at this point, Plaintiff asked Ms. McGaskill where A.B. was. Ms. McGaskill left the room and brought A.B. back to her parents. When A.B. came into the room and saw her parents, she started crying. Ms. McGaskill told them that A.B. had written a statement and asked A.B. if she wanted to read it. A.B. said no. Then Ms. McGaskill, with A.B.'s permission, read A.B.'s written statement.

When Ms. McGaskill and Ms. Gantt were talking to Plaintiff, they kept talking about inappropriate touching. That was it, no further details. Then Ms. McGaskill told A.B. and Plaintiff to follow her to another room where a deputy sheriff asked if she wanted to press charges against S.H. The deputy told them that they would have to go with him to Child Protect located in downtown Montgomery where there would be people more equipped to talk to a child about what happened to her.

At that time, they returned to the room where Mr. Gamble was waiting and Plaintiff started to break down. Outside the room, she asked Ms. McGaskill if she needed to take her daughter to a hospital to be examined. Ms. McGaskill responded to Plaintiff, "No, ma'am, it was just inappropriate touching."

Plaintiff asked Mr. Sikes to let her view the video but Mr. Sikes told her that she could not view it because others students appeared on it. Mr. Gamble asked Mr. Sikes if he could buy it. Mr. Sikes again refused to allow them to have or view the video.

Afterwards, Plaintiff asked SRO Forbes where S.H. was at that time. SRO Forbes told Plaintiff to calm down. Plaintiff told SRO Forbes that they better keep S.H. locked up. She stated that she did not know what S.H. did to her daughter but she was livid. She then asked how does she press charges. SRO Forbes told her that she could not do anything at that time but she and A.B. had to go to Child Protect. SRO Forbes told Plaintiff that they had to wait until the other officers left with S.H. but they could not make any promises that they would keep S.H. locked up.

Plaintiff, her husband, and A.B. then followed the deputy sheriff who had been with them to Child Protect where they waited in the lobby while A.B. was being questioned. Plaintiff was asked to go into the room where A.B. was talking to a deputy sheriff about social media. The deputy explained that A.B. told him that Snapchat posts disappear twenty-four hours after posting. Later, when A.B. came out, she had a teddy bear and a blanket. The Child Protect people gave Plaintiff some brochures to review and explained to her the program offered at Child Protect. Then A.B. and her parents went home.

No one from the school contacted Plaintiff over the following weekend. Plaintiff stated that A.B. became ashamed and angry. Plaintiff asked A.B. lots of questions about exactly what happened, why she did not tell Plaintiff about it, and how long had it been going on. A.B. stayed in her bed and cried over the weekend.

A.B. rode the bus to school on Monday morning, October 28, 2019. Later in the day, A.B. called Plaintiff asking her to come pick her up from school because when she got on the bus that morning, all the kids were saying "Free Steve, free Steve." Plaintiff told A.B. she would come pick her up and that they would speak to Ms. McGaskill when she got there.  When she got to the school to check A.B. out of school early, Plaintiff asked to see Ms. McGaskill. Plaintiff told Ms. McGaskill what had happened to A.B. on the school bus that morning. Ms. McGaskill responded that she could not do anything about things that she did not hear. At that point, Plaintiff informed Ms. McGaskill that A.B. would not be riding the bus to or from school any longer.

After that, Plaintiff had another conversation with Ms. McGaskill about inappropriate statements made to A.B. at school by S.H.'s basketball teammates like, "How many fingers ... ." At this point in the deposition, defense counsel interrupted Plaintiff's answer saying, "I think we know what the reference is, don't we?" Plaintiff responded affirmatively.  The "reference" was set out in paragraph 16 of the Second Amended Complaint. ("How many fingers did Steve get in you?"). When Plaintiff brought these harassing remarks to Ms. McGaskill's attention, she said the same thing: She could not do anything about anything she did not hear.

Later, Plaintiff had another conversation with Ms. McGaskill about other students continuing to harass A.B. at school verbally with inappropriate

sexual comments about the incident with S.H.  Ms. McGaskill's response was the same and nothing was done to stop the harassment.  The harassment kept going because Ms. McGaskill did nothing to stop it.

Subsequently, Plaintiff went to the school and asked for a copy of A.B.'s written statement. Plaintiff was told by the lady at the window that the school did not have A.B.'s statement.  At that point, Plaintiff thought there was nothing else she could do to get A.B.'s statement.

Almost a year after A.B.'s sexual assault on the school bus, Plaintiff and A.B. went to court to testify against S.H. Someone from the school called Plaintiff to tell her that S.H. had been expelled. No one from the school testified in court about A.B.'s sexual assault.

During her preparation with ADA Jazmine Willingham for testifying in court against S.H., Plaintiff learned that many details of A.B.'s sexual assault had been hidden from her by school officials. When Plaintiff reviewed the video with ADA Willingham, she learned for the first time that during the sexual assault, S.H. choked A.B.  School officials hid this fact from Plaintiff.  Plaintiff also learned that S.H. placed his fingers inside A.B.'s vagina. This fact was also hidden from Plaintiff by school officials. Plaintiff stated that school officials should have told her the truth instead of telling her that there was just inappropriate touching involved. *Id.* "Inappropriate touching" could have meant S.H. just "smacked her on the booty."

A.B. did not tell Plaintiff that S.H. put his fingers in her. A.B. just acted mean and angry. When Plaintiff asked A.B. about the incident, she would say she did not want to talk about it and cry. So Plaintiff did not understand what was going on with her daughter. School officials had the video that they refused to allow Plaintiff to view. But school officials knew that A.B. had been assaulted on the school bus for three consecutive days with S.H. choking A.B., putting his hands inside her panties and under her shirt.  School officials should have told Plaintiff the truth, instead of hiding the truth.  Plaintiff did not find out what happened to her daughter until a year after her assault on the day before they went to court to testify against S.H. That day was when Plaintiff fully understood for the first time that her daughter had been traumatized and that she needed counseling that was never offered or suggested by the school.

Plaintiff searched the internet for places where A.B. could get counseling and where Medicaid would be accepted.   Plaintiff found the Family Sunshine Center in Montgomery for battered women and children. By telling Plaintiff that what happened to A.B. on the school bus was "inappropriate touching," school officials were playing down the seriousness of the offense to Plaintiff. This was confirmed when Plaintiff asked Ms. McGaskill if she needed to take A.B. to a hospital and Ms. McGaskill told her that "it was just inappropriate touching." Plaintiff testified that on the day the school found out about A.B.'s sexual assault, they should have had a counselor there to help A.B. deal with the situation. When Plaintiff reported to Ms. McGaskill about other students sexually harassing A.B. on the bus and at school, they should have had a counselor there to help A.B. deal with that situation.

Renee Ingram was A.B.'s counselor at the Family Sunshine Center. Plaintiff wanted counseling for her daughter because she did not want to find her hanging in a closet or lying on the floor.   The video that Plaintiff and her husband viewed at the District Attorney's office on the day before S.H.'s trial provided a clear view in minute detail of what happened to A.B.

Plaintiff stated that when she viewed the video at the District Attorney's office, she viewed three days of video.   Plaintiff testified that the video provided by Defendant in discovery did not show a clear image of what happened to A.B.   The video that Defendant provided in discovery shows S.H. and A.B. sitting right behind the bus driver. The video that Plaintiff and her husband were shown at the District Attorney's office in September 2020, showed S.H. and A.B. sitting about the middle of the bus with the camera positioned on the right side of the bus directly across from their seat on the bus.   The video that Plaintiff and her husband were shown at the District Attorney's office was not the video that Defendant produced in discovery.

A.B. testified that Steve came and sat beside her on the bus and touched her thigh and then started choking her. Steve was trying to hurt her. A.B. told Steve to stop but he kept going. Steve touched A.B. in her genital area. This happened three times during the week that ended on October 25, 2019. Steve hid what he was doing by placing his book bag over A.B. so that others could not see what he was doing. A.B. told Steve to stop but he did not stop. Steve assaulted A.B. twice on afternoon school bus runs and also on the morning run. A.B. did not tell any adult what happened until she told Ms. McGaskill. A.B. did not tell anyone about what Steve did to her because

she was embarrassed. Ms. McGaskill told A.B. that Mr. Frazier had reported to the school system what Steve did to her. A.B. told Ms. McGaskill that what Mr. Frazier told her was correct. It happened to her.

A.B. had another meeting with Ms. McGaskill to tell her what happened when she rode the school bus to school the following Monday morning. A.B. told Ms. McGaskill that other students were picking on her on the bus about what happened. Ms. McGaskill told A.B. that if she did not hear what was said to A.B. by the other students, she could not do anything about it. A.B. testified that the comments to her from other students were communicated to her in the form of a rap song. A.B. did not ride the bus anymore after riding on Monday, October 28, 2019.

A.B. was embarrassed when other students harassed her on the bus after the incident. A.B. complained to Ms. McGaskill about the harassment she suffered on the bus after the incident but Ms. McGaskill told A.B. that she could not do anything about it. A.B. stated that the other students also harassed her at school in the hallway and in the cafeteria about the incident. A.B. stated that she never complained any more to Ms. McGaskill but her mom complained to Ms. McGaskill. A.B. complained to her mom about harassment at school about three or four times. A.B.'s counselor, Ms. Renee, was at the Family Sunshine Center. A.B. had difficulty studying and staying focused on her studies because of what happened on the bus. Nobody at school offered the school counselor to A.B. as someone who could help her. The video A.B. was shown at the District Attorney's office clearly showed Steve choking her.

At the beginning of A.B.'s therapy, Ms. Ingram met with Plaintiff who told her that A.B. was not sleeping well, that she was withdrawn, that she would experience crying spells but would not discuss why she was crying. These symptoms indicated to Ms. Ingram that A.B. had been traumatized by something that she was not quite ready to discuss. A.B. responses to several questions asked by Ms. Ingram during her sessions with her indicated that A.B. did not have a very high regard of herself. Ms. Ingram attributed her low self esteem to the trauma she suffered.

In May, 2022, A.B. disclosed in therapy that she had a thought during the previous week of suicide but she was not actively suicidal and did not have an active plan. Ms. Ingram confirmed that A.B. thought about killing herself but she did not have a plan about how to do it. This was the first time

A.B. had disclosed anything about suicide. After several inquiries from Ms. Ingram to A.B., Ms Ingram concluded that A.B. did not have an intent to commit suicide.

During her session in September, 2022, A.B. was unresponsive and withdrawn. Ms. Ingram terminated the session after a half hour. Although Ms. Ingram made some progress with A.B. during her therapy, she was not successful in getting A.B. to process her trauma. Ms. Ingram terminated A.B.'s therapy because she did not think that future sessions would yield any progress. After terminating her therapy, A.B. did not contact Ms. Ingram to resume therapy. Ms. Ingram believes that it would have been beneficial to A.B. if she had been able to discuss her trauma during therapy because it would have allowed her to work through her emotions and thoughts concerning her trauma.

The intake records completed when A.B. began her therapy with the Family Sunshine Center indicated that she was bullied and ridiculed by other students for her sexual assault.

Ms. Ingram stated that A.B. had indicated that she and a cousin had been engaged in an inappropriate sexual relationship for a few months. Ms. Ingram testified that as her therapy with A.B. went on, she made adjustments in her treatment plan, for example, to address A.B.'s personal safety and boundary setting in connection with her relationship with her cousin.

In Ms. Ingram's experience with victims of sexual assault, the trauma of that event can lead to sexual promiscuity. A.B. did not tell Ms. Ingram that the sexual contact with her cousin was involuntary. The session with Ms. Ingram in which A.B. disclosed her sexual relationship with her cousin was the same session in which she disclosed that she had thought about committing suicide.

A.B. suffered from epilepsy in her early years and the condition affects her ability to remember things accurately.

As a direct and proximate result of the deliberate and intentional refusal by Defendant Pike Road Board of Education, after responsible school officials were placed on actual notice of A.B.'s sexual harassment by students at Pike Road High School, to take appropriate and necessary remedial action, A.B. was caused to undergo continued sexual harassment by

students at Pike Road High School in violation of rights guaranteed to her to be free from discrimination on the basis of her sex by any recipient of federal education funding under Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373, as amended, 20 U.S.C. §§ 1681 *et seq.* The sexual harassment that A.B. suffered was so severe, pervasive, and objectively offensive that it denied A.B. the equal access to education that Title IX is designed to protect.

The response, and/or lack of response, by Defendant Pike Road Board of Education to Plaintiff's report of sexual harassment against A.B. by students was clearly unreasonable in light of the circumstances known to Defendant Pike Road Board of Education *e.g.*, the knowledge on the part of responsible school officials that A.B. had been the very recent victim of a physical and sexual assault on the school bus and that A.B.'s parents had reported to the Assistant Principal at Pike Road High School that students were retaliating against A.B. on account of her report of her sexual assault by Steve H. by shouting at her, taunting her, and imploring her to "Free Steve," in addition to other sexually harassing and retaliatory statements.

Defendant Pike Road Board of Education was deliberately indifferent to Plaintiff's reports on multiple occasions to responsible school officials of the occurrences of sexual harassment and retaliation against A.B. by other students at Pike Road High School on account of her report of her sexual assault all of which happened on school grounds and property during school hours. Defendant Pike Road Board of Education had authority to take remedial action to address and correct the sexual harassment and retaliation suffered by A.B. but instead affirmatively chose to do nothing to protect A.B. from the injurious and harmful retaliation she suffered from other students at Pike Road High School on account of her report of her sexual assault.

Plaintiff seeks an award of monetary damages for Defendant's violation of Title IX. Because Plaintiff did not believe A.B. would be safe riding the bus to and from school, she took A.B. to and from school each day, which prevented Plaintiff from continuing her employment. At the time, Plaintiff was earning $12.00 per hour working for Med Health Urgent Care in Montgomery and was working at least 40 hours per week. Plaintiff seeks damages to compensate her for her lost income between the end of October, 2019, and the end of the school year in May, 2020. In addition, Plaintiff had to purchase a laptop computer in order for A.B. to attend Alabama Connections Academy online. The computer cost approximately $500.

Further, it was necessary to have high speed internet service at Plaintiff's home for A.B. to attend the online school. High speed internet service cost Plaintiff approximately $150 per month beginning in August, 2020, through the present. Plaintiff further seeks an award of her reasonable attorney's fees and costs of litigation.

(b)   The defendant[1]

The Pike Road Board of Education ("the Board") contends that, under the undisputed facts, the Plaintiff has not met and cannot meet the evidentiary and legal standards required to sustain a viable Title IX claim. Under any formulation of the governing liability standard(s), Plaintiff must show, at a minimum, that the student in question was subjected to actionable discrimination that is ascribable to the Board itself[2] *and* show that the Board displayed deliberate indifference to— and thus culpability for—unlawful conduct and its clear consequences.

The operative liability analysis in a Title IX case predicated on student-on-student sexual harassment has been established by the Supreme Court in Davis v. Monroe Cnty. Bd. of Ed., 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). The plaintiff must show not only that the school district was deliberately indifferent to known acts of harassment, but also that the known harassment was "so severe, pervasive, and objectively offensive that it denie[d] its victims the equal access to education that Title IX is designed to protect."[3]

The Supreme Court has set that high standard for peer-on-peer sexual harassment in order "to guard against the imposition of sweeping liability," and in recognition that:

---

1 The Defendant's contentions with respect to the relevant facts and application of governing law to the facts are set forth at length in its briefs submitted in support of its pending motion for summary judgment (Docs. 69, 78).   To the extent helpful and appropriate, those submissions are incorporated herein by reference.   For purposes of the pretrial order itself, the Board's contentions are summarized below.

2 In the Title IX context, "deliberate indifference" is tantamount to "an official decision … not to remedy the violation."   Sauls v. Pierce County School Dist., 399 F.3d 1279, 1284 (11th Cir. 2005), *citing* Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 276 (1998).

3 Hill v. Cundiff, 797 F.3d 948, 968-69 (11th Cir. 2015), *quoting* Davis, 526 U.S. at 651-52, 119 S.Ct. at 1675.

[u]nlike an adult workplace, children may regularly interact in a manner that would be unacceptable among adults. Due to their immaturity, children at various ages will invariably engage in some forms of teasing, shoving, and name-calling that target differences in gender. Some risk of sexual harassment is inherent to the enterprise of public education, in particular, because public schools must educate even the most troublesome and defiant students.

Hill v. Cundiff, 797 F.3d 948, 969 (11th Cir. 2015) (*quoting* Davis, 526 U.S. at 651-52, 119 S.Ct. at 1675–76). Accordingly, to sustain a claim for peer harassment under Title IX, the plaintiff faces a heavy burden:

(1) the defendant must be a recipient of federal education funding; (2) an "appropriate person," meaning an official of the funding recipient who, "at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf,"   must have had (3) actual knowledge of the sexual harassment and discrimination the plaintiff suffered; (4) the sexual harassment must have been "sufficiently 'severe, pervasive, and objectively offensive'" by Title IX standards; (5) the funding recipient must have been deliberately indifferent to the sexual harassment and discrimination the plaintiff endured; (6) the funding recipient's actions must have caused the plaintiff to undergo sexual harassment or made the plaintiff more vulnerable to it or its effects*.*; and (7) the funding recipient's deliberate indifference to the harassment and discrimination must have effectively barred the plaintiff's access to an educational opportunity or benefit.

Stinson as next friend of K.R. v. Maye, 824 F. App'x 849, 856–57 (11th Cir. 2020) (internal citations omitted).

The relevant standard is not met by second-guessing the wisdom or effectiveness of the Board's response to objectionable conduct.[4]   The response

---

4 As the Fifth Circuit has observed, "Judges make poor vice principals. . . ." Doe v. Galster, 768 F.3d 611, 619 (7th Cir. 2014), *quoting* Estate of Lance v. Lewisville Indep. School Dist.*,* 743

must simply have not been clearly unreasonable under the circumstances.   Those circumstances include recognition of the immature and intractable behavior of public school students as well as the inherent difficulty of anticipating and preempting such behavior.   Here, the undisputed evidence establishes that (1) involved Board staff responded promptly and decisively to permanently interdict the offending behavior and mitigate its adverse effects to the extent it was within their power to do so; and that (2) A.B. suffered no deprivation of educational benefit or other cognizable injury as a result of the Board's response to the events that precipitated the suit.

In any case, because neither A.B. nor her parents have sustained measurable financial loss as a result of the events in question, there is no monetary relief to be awarded.   Moreover, after completing the 2019-2020 school year, A.B. withdrew from Pike Road schools thereby effectively foreclosing the availability of injunctive relief.   The case is thus moot or otherwise nonjusticiable and must be dismissed as a matter of law.

5.     <u>STIPULATIONS OF THE PARTIES</u>:

1.     In the fall of 2019, A.B. was a ninth grade student at Pike Road High School.

2.     A. B. rode a Pike Road School bus to and from school.

3.     Another male student, S.H., an eleventh grade student at Pike Road High School, also rode the same bus to and from school.

4.     On or about Wednesday, October 23, 2019, S.H. began sitting next to A.B. on the bus.

5.     At all times pertinent to the case, the school bus on which A.B. and S.H. were riders was driven by Mr. Jarvis Frazier.

6.     Mr. Frazier formed a suspicion that inappropriate activity could be taking place based on the size difference between S.H. and A.B. and a "gut feeling."

---

F.3d 982, 996 (5th Cir.2014).

7.     Acting on his suspicion, Jarvis Frazier directed S.H. to change seats.

8.     Upon reviewing bus videos, Mr. Frazier and other Transportation Department personnel concluded that S.H. had engaged in inappropriate conduct, and referred the matter for further review to Transportation Supervisor Angela Lang.

9.     Following an initial investigation and interview with S.H., Montgomery County Sheriff's deputies arrested and incarcerated S.H. on Friday, October 25, 2019.

10.     S.H. was concurrently suspended from school pending expulsion proceedings and was subsequently expelled from school by the Board.

11.     After completing the ninth grade at Pike Road High School, A.B.'s mother thought it would be best for her to enroll in the Alabama Connections Academy where she has been enrolled since the beginning of 2020-2021 school year.

12.     Alabama Connections Academy is an accredited, tuition free, online public education program that incorporates live lessons into the curriculum.

13.     A.B. has enjoyed the online approach to education and has earned mostly As and Bs.

14.     A.B. is on track to graduate in 2024 and plans to enroll after graduation in cosmetology school.

***

It is ORDERED that:

(1)  The jury selection and trial of this cause, which

15

is to last three days, are set for February 5, 2023, at
10:00 a.m. at the United States Courthouse in Montgomery,
Alabama;

(2) A trial docket will be mailed to counsel for
each party approximately two weeks prior to the start of
the trial term;

(3) Each party shall have available at the time of
trial, for use by the court (the judge, the courtroom
deputy clerk, and the law clerk), three copies of the
exhibit list and two extra copies of each photostatically
reproducible exhibit. Any publication of exhibits to the
jury will be done through use of the ELMO in the
courtroom, and no exhibit is to be shown or published to
the jury without it being admitted into evidence. Any
exhibits which the parties wish to use in their opening
statements can be shown to the jury if the parties jointly
stipulate that the exhibit is admitted into evidence in
advance of trial. With respect to demonstratives, they
may be used in voir dire, opening statements, examination

16

of witnesses, and in closing statements if (a) they accurately reflect the evidence, and (b) they have been shown to opposing counsel in advance of trial such that opposing counsel has sufficient time to review the demonstrative and timely raise any objections to the court with respect to the use thereof;

(4) Trial briefs ((a) summarizing the evidence to be presented at trial, (b) setting forth the elements of each and every claim and defense at issue and how the evidence does or does not satisfy those elements, and (c) addressing any evidentiary issues that may arise at trial) are required to be filed by ten days before trial;

(5) All deadlines not otherwise affected by this order will remain as set forth in the uniform scheduling order (Doc. 55) entered by the court on October 27, 2022; and

(6) All understandings, agreements, deadlines, and stipulations contained in this pretrial order shall be binding on all parties unless this order be hereafter

modified by order of the court.

DONE, this the 13th day of December, 2023.

 /s/ Myron H. Thompson 
UNITED STATES DISTRICT JUDGE